# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KEVIN BRIAN MITCHELL,

    Plaintiff,

  v.                                             Case No. 19-CV-552

RANDALL MANTHEI and
CHRISTOPHER BOUZEK,

    Defendants.

## ORDER

    Plaintiff Kevin Brian Mitchell, a former Wisconsin state prisoner representing himself, filed this civil rights action under 42 U.S.C. § 1983. The court allowed Mitchell to proceed on an Eighth Amendment claim against defendants Randall Manthei and Christopher Bouzek based on allegations that, despite his lower bunk medical restriction, Sergeant Manthei moved him to an upper bunk and Sergeant Bouzek denied his requests to transfer back to a lower bunk assignment. (ECF No. 18 at 4.) On October 16, 2020, the defendants filed a motion for summary judgment. (ECF No. 45.) On November 30, 2020, the court ordered that, if Mitchell did not file a response to the defendants' motion by December 18, 2020, it would resolve the motion based on the defendants' submissions. (ECF No. 52.) Mitchell has not filed a response.

1. **Undisputed Facts**

Mitchell was confined at Waupun Correctional Institution (Waupun) at all times relevant to his allegations. (ECF No. 47 at ¶1.) Defendants Christopher Manthei and Randall Bouzek were correctional sergeants at Waupun during the relevant time. (*Id.* at ¶¶3-4.)

On February 1, 2019, Mitchell asked staff to move him to a new cell because he was having issues with his cellmate. (ECF No. 47 at ¶5.) Security Supervisor Rymarkiewicz instructed Sergeant Manthei to move Mitchell because of the issues Mitchell reported. (*Id.* at ¶6.) Sergeant Manthei was not familiar with Mitchell and did not know he had a lower bunk accommodation. (*Id.* at ¶7.) Sergeant Manthei does not remember moving Mitchell, but it would have been his normal practice to check the dry erase board in the cell hall for available cells and to check the Wisconsin Integrated Corrections System (also known as WICS) for any special placement needs or medical restrictions. (*Id.* at ¶8.) At the time of this move, J-12 was the only cell with an available bed, so Sergeant Manthei moved Mitchell from J-17 to J-12. (*Id.* at ¶9.) Mitchell had a low bunk restriction at the time, but Sergeant Manthei forgot to check WICS before moving Mitchell. (*Id.* at ¶10.) Sergeant Manthei was regularly the first-shift food service sergeant, but on February 1, he worked overtime in the cell hall. (*Id.* at ¶11.) Because Sergeant Manthei did not typically work in the cell hall, he was not normally involved in moving inmates, and this lack of familiarity with the process is why he believes he forgot to check WICS. (*Id.* at ¶12.)

Mitchell moved to J-12, and his cellmate there, inmate Michael Hoskins, also had a low bunk restriction. (ECF No. 47 at ¶13.) Even though Mitchell was assigned to the upper bunk in J-12, he slept on the bottom bunk the night of February 1. (*Id.* at ¶14.) Mitchell did not inform Sergeant Manthei or Sergeant Bouzek of his lower bunk restriction on February 1. (*Id.* at ¶15.)

During morning medication pass the next day (February 2), Sergeant Bouzek noticed that Mitchell and Hoskins were cellmates. (ECF No. 47 at ¶16.) Being familiar with the inmates on his cell hall, Sergeant Bouzek knew Mitchell and Hoskins both had low bunk restrictions. (*Id.* at ¶17.) Sergeant Bouzek checked WICS and confirmed that Mitchell was assigned to the upper bunk in J-12. (*Id.* at ¶18.) Upon learning of the housing assignment conflict, Sergeant Bouzek told Mitchell he would attempt to find him a low bunk assignment. (*Id.* at ¶21.) Sergeant Bouzek offered to return Mitchell to the lower bunk in his old cell, but Mitchell declined and said he would wait for Sergeant Bouzek to find another alternative. (*Id.* at ¶23.) Sergeant Bouzek told Mitchell that he would try to locate an alternative bunk during his shift, but that he may have to relocate other inmates before doing so. (*Id.* at ¶24.) Moving inmates is not a simple task, and staff has to consider many factors, including an inmate's personality, his security threat group involvement, his Prison Rape Elimination Act classification, possible gang affiliations, any restrictions the inmate has, staff's own observations of the inmate with others or staff's own interactions with the inmate, and whether the inmate and his possible cellmate have a history or relationship with each other. (*Id.* at ¶25.)

3

During the noon count on February 2, Sergeant Bouzek learned that Mitchell was lying on his floor, apparently non-responsive. (ECF No. 47 at ¶26.) He promptly called a medical emergency over the institution radio and asked for a supervisor and health service unit staff. (*Id.* at ¶27.) Nurse Robert Weinman assessed Mitchell in his cell and documented the encounter. (*Id.* at ¶28.) Weinman wrote that Mitchell was able to converse with him "with no issues and did so calmly and with no outward" signs or symptoms "of pain noted." (*Id.* at ¶29.) Weinman also documented that Mitchell was "moving all extremities and head at this point," and that there were "[n]o marks or discolorations noted to [Mitchell's] face, head, or neck areas." (*Id.*) Weinman noted that Mitchell reported low back pain, which was a longstanding issue for Mitchell. Weinman wrote that he checked Mitchell's lower extremities, "which [were] both normal," and that Mitchell could stand and support himself. (*Id.*) Weinman documented that he tried to perform other assessments, but Mitchell became agitated with security and stopped following directives. (*Id.* at ¶30.) Weinman reported that Mitchell tried to "kick out" at the officers at one point. (*Id.*) In summary, Weinman wrote that, due to Mitchell's "ability to stand, talk freely, and kick out at officers, [patient] okay to wait on assessment as he does not show any immediate danger." (*Id.*) Weinman arranged for Mitchell to have a full assessment the next day. (*Id.*)

While Nurse Weinman assessed Mitchell, Sergeant Bouzek spoke with inmate Hoskins. (ECF No. 47 at ¶31.) Hoskins told Bouzek that Mitchell did not fall from his bunk, that Mitchell was trying to get a lawsuit, and that Mitchell was trying to get

4

Bouzek in trouble. (*Id.* at ¶32.) Bouzek instructed Hoskins to relay that information to a supervisor, and he believes Hoskins later spoke to Lieutenant Nelson. (*Id.* at ¶33.)

On February 3, Nurse Weinman again assessed Mitchell and documented the encounter. (ECF No. 47 at ¶34.) Weinman wrote that he called the cell hall, and staff reported that Mitchell was running up and down the stairs without issue and was smiling. (*Id.*) Weinman documented that he watched Mitchell walk across the yard and saw no issues, but when Mitchell entered the health services unit he started to limp and complain about back and left leg pain. (*Id.*) Weinman wrote that he performed several assessments, and that Mitchell requested "good meds." (*Id.*) Weinman documented that he explained he could not provide medications because he was a nurse and that, "frankly his assessments and overall conditions [did] not match his complaint." (*Id.*) Weinman reported that Mitchell became agitated when he could not provide Mitchell with the requested medication and when he told Mitchell he would not provide crutches because Mitchell had "easily" walked to the health services unit and showed no need for crutches. (*Id.*)

On April 30, 2019, Mitchell received a computerized tomography (CT) scan of his head or brain because of his complaints of ongoing headaches after his alleged fall. (ECF No. 47 at ¶44.) The scan showed:

FINDINGS:

INTRACRANIAL STRUCTURES: No acute intracranial hemorrhage. No unusual extra-axial fluid collections. The ventricles are normal in

5

> size and contour No midline shift. The brain shows normal density throughout. No mass or mass effect.
>
> SKULL: The skull is intact. No bone destruction.
>
> PARANASAL SINUSES: Paranasal sinuses and mastoid air cells are clear. No significant mucosal thickening. No fluid levels.
>
> ORBITAL SOFT TISSUES: No soft tissue masses or fluid collections. Good symmetry.

(*Id.* at ¶45.) In short, Mitchell had a "[n]ormal exam." (*Id.*)

### 2. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### 3. Analysis

The defendants contend that they are entitled to summary judgment because Mitchell cannot produce evidence supporting his claims that the defendants acted with deliberate indifference. (ECF No. 46 at 10, 12-14.)

The Eighth Amendment to the United States Constitution imposes a duty on prison officials to "provide humane conditions of confinement," which includes

6

ensuring that inmates "receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To succeed on a claim that a prison official provided constitutionally deficient medical care, an inmate "must prove that he 'suffered from an objectively serious medical condition' and that the defendant was 'deliberately indifferent to that condition.'" *Davis v. Kayira*, 938 F.3d 910, 914 (7th Cir. 2019) (citation omitted). To show deliberate indifference Mitchell must demonstrate that the defendants were "actually aware of a serious medical need but then [were] deliberately indifferent to it." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). "Deliberate indifference requires a showing of more than mere or gross negligence, but less than purposeful infliction of harm." *Id.* (citing *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003)); *Profitt v. Ridgway*, 279 F.3d 503, 506 (7th Cir. 2002) (explaining that deliberate indifference to a prisoner's safety implies the avoidance of a known risk, not merely foreseeable risk).

When Sergeant Manthei was directed to move Mitchell to a different cell he did not know that Mitchell had a lower bunk restriction. While he does not recall moving Mitchell, Manthei thinks he forgot to check WICS because he did not typically work on the cell hall or move inmates. Since Manthei did not know that Mitchell had a lower bunk restriction, his movement of Mitchell to a cell with an inmate who also had a lower bunk restriction was not deliberately indifferent.

Upon realizing Sergeant Manthei's mistake, Sergeant Bouzek acted promptly to address it. Mitchell declined Bouzek's offer to return to his prior cell where he had a lower bunk. Bouzek told Mitchell he would try to get him moved to another cell

7

during his shift. Mitchell fell from the top bunk that same day. Based on the undisputed facts, no reasonable factfinder could conclude that Bouzek acted with deliberate indifference.

Thus, the court will grant the defendants' motion for summary judgment and dismiss this case.

## ORDER

**THEREFORE, IT IS ORDERED** that the defendants' motion for summary judgment (ECF No. 45) is **GRANTED.**

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing Mitchell's claims and this action.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time,

generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 4th day of January, 2021.

_William E. Duffin_
WILLIAM E. DUFFIN
U.S. Magistrate Judge